**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OMID YOUSOFI and KASEY KING, Derivatively on Behalf of FLUOR CORPORATION, | Case No.: |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| PETER K. BARKER, ALAN M. BENNETT, ROSEMARY T. BERKERY, ALAN BOECKMANN, DAVID E. CONSTABLE, PETER J. FLUOR, JAMES T. HACKETT, CARLOS M. HERNANDEZ, THOMAS C. LEPPERT, DEBORAH D. McWHINNEY, ARMANDO J. OLIVERA, and MATTHEW K. ROSE | |
| Defendants, | |
| FLUOR CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Omid Yousofi and Kasey King ("Plaintiffs"), derivatively and on behalf of Fluor Corporation ("Fluor" or the "Company"), by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fluor, Company press releases and conference call transcripts, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for

the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Fluor against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties, unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between November 2, 2017 to the present (the "Relevant Period") and have caused substantial harm to the Company.

2.     Throughout the Relevant Period, Defendants inflated the Company's revenue and earnings by improperly recognizing revenue on sixteen (16) separate projects.  Once awarded a contract to perform work on a project, the Company would routinely submit "change forms" to its clients in which the Company would request additional funds to cover its cost overruns that resulted from "unforeseen circumstances," funds which the client was not contractually obligated to pay.  When the Company determined, through its own assessment, that it was "likely" that the client would accept their change order, the Company would book the additional revenue.  This was contrary to the assurances to the market that the Company would only recognize revenue from its submission of these change orders if it determined that "recovery of incurred costs is probable and the amounts can be reliably estimated."

3.     Defendants had been secretly utilizing change orders, among other tactics, to improperly inflate the Company's revenue and earnings by recognizing additional revenue on its contracts despite having no reasonable basis to do so.

4.     On May 2, 2019, the Company disclosed to investors that its Chief Executive Officer ("CEO") David T. Seaton had left the Company, effective immediately, and would be replaced by interim CEO and Chief Legal Officer Carlos M. Hernandez.  In addition, the Company

significantly reduced its earnings guidance, and disclosed that it was taking over $100 million in charges.

5.      On this news, the Company's share price fell $9.43 per share, or 24%, closing at $29.72 per share on May 2, 2019.

6.      On August 1, 2019, the Company revealed that it would be taking a $714 million pre-tax charge on approximately 16 different projects (the "2Q 2019 Projects"), including incurring a $233 million charge on a project in which Fluor serves as a subcontractor for British Aerospace Engineering Systems, Inc. ("BAE") in its work on the United States Army Radford Army Ammunition Plant (the "Radford Project").

7.      On this news, the Company's share price fell $8.24 per share, over 26%, closing at $22.67 per share on August 2, 2019.

8.      On February 18, 2020, the Company revealed that the SEC was investigating the Company's past accounting and financial reporting and had requested additional information related to the 2Q 2019 Projects.  Further, the Company announced that it had also commenced its own internal investigation into the 2Q 2019 Projects, "focusing initially on the Radford [Project]." As a result of these investigations, the Company announced that it would not be able to complete and file its Form 10-K on time.

9.      On this news, the Company's share price fell $4.75 per share, over 24%, closing at $14.79 per share on February 18, 2020.

10.      As a result of Defendants' wrongful acts and omissions, which caused the precipitous decline in the market value of the Company's common stock, the Company has suffered significant damages.

## II.      JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

### A.      Plaintiffs

13.      Plaintiff Omid Yousofi is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

14.      Plaintiff Kasey King is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

### B.      Nominal Defendant

15.      Defendant Fluor is a global engineering, procurement, construction, and maintenance company that designs, builds and maintains energy and gas facilities for both public and private clients.  Fluor is incorporated in Delaware with its principal executive offices located at 6700 Las Colinas Boulevard, Irving, Texas.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FLR."

C.      **Directors**

16.      *Defendant Peter K. Barker* ("Barker) has served as a director of the Company since 2007.  Defendant Barker also serves as a member of the Audit Committee and Organization and Compensation Committee.

17.      *Defendant Alan M. Bennett* ("Bennett") has served as a director of the Company since 2011.  Defendant Bennett also serves as Chair of the Audit Committee and a member of the Executive Committee and Organization and Compensation Committee.  Defendant Bennett is also a director of The TJX Companies, Inc.

18.      *Defendant Rosemary T. Berkery* ("Berkery") has served as a director of the Company since 2010.  Defendant Berkery also serves as Chair of the Governance Committee and a member of the Executive Committee and Audit Committee.  Defendant Berkery is also a director of The TJX Companies, Inc.

19.      *Defendant Alan Boeckmann* ("Boeckmann") has served as a director of the Company since 2019 and has previously held that directorial position from 2001 to 2012.  Defendant Boeckmann has also served as non-executive Chairman of Fluor Corporation from 2011 until his retirement in 2012; Chairman and Chief Executive Officer of Fluor Corporation from February 2002 until his retirement in 2011; and joined Fluor in 1979 with previous service from 1974 to 1977.  Defendant Boeckmann also serves as the Executive Chairman of Fluor Corporation since May 1, 2019.  Defendant Boeckmann is also the Chiar of the Executive Committee.

20.      *Defendant Peter J. Fluor* ("Fluor") has served as a director of the Company since 1984.  Defendant Fluor is a member of the Executive Committee Executive.  Defendant Fluor is a director of Anadarko Petroleum Corporation.

21.      *Defendant James T. Hackett* ("Hackett") has served as a director of the Company

since 2016. Defendant Hackett is the Chairman of the Organization and Compensation Committee. He is also a member of the Executive Committee and the Commercial Strategies and Operational Risk Committee. Defendant Hackett was Chief Executive Officer of Anadarko from 2003 to 2012.

22.     **Defendant David E. Constable** ("Constable") has served as a director of the Company since 2019. Defendant Constable is the Chairman of the Commercial Strategies and Operational Risk Committee. He also serves as a member of the Executive Committee and the Governance Committee.

23.     **Defendant Carlos M. Hernandez** ("Hernandez") has served as a director of the Company since 2019. Defendant Hernandez also serves as the interim CEO from May 1, 2019, until May 16, 2019, when he was appointed as Fluor's CEO. Hernandez also served as the Chief Legal Officer from October 2007 until May 2019. Defendant Hernandez is also a member of the Executive Committee.

24.     **Defendant Deborah D. McWhinney** ("McWhinney") has served as a director of the Company since 2019. Defendant McWhinney also serves as a member of the Audit Committee and Governance Committee.

25.     **Defendant Matthew K. Rose** ("Rose") has served as a director of the Company since 2014. Defendant Rose also serves as a member of the Audit Committee and the Organization and Compensation Committee.

26.     **Defendant Armando J. Olivera** ("Olivera") has served as a director of the Company since 2012. Defendant Olivera also serves as a member of the Organization and Compensation Committee and the Commercial Strategies and Operational Risk Committee.

27.     **Defendant Thomas C. Leppert** ("Leppert") has served as a director of the Company

since 2019. Defendant Leppert also serves as a member of the Governance Committee and the Commercial Strategies and Operational Risk Committee.

28.     Defendants Barker, Bennett, Berkery, Boeckmann, Fluor, Hackett, Constable, Hernandez, McWhinney, Rose, Olivera and Leppert, are collectively hereinafter referred to as the "Director Defendants."

29.     The Directors Defendants breached their duties to the Company by making or causing the Company to make false statements that artificially inflated the price of Fluor securities during the Relevant Period. The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Fluor's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

## THE AUDIT COMMITTEE CHARTER

30.     The Audit Committee Charter states in relevant part:

**PURPOSE AND ACTIVITIES**

**A.     Statement of Purpose**

The Audit Committee (the "Committee") shall

l.      Represent and assist the Company's Board of Directors in fulfilling its oversight responsibility for:

    (a)     the accounting, reporting and financial practices of the Company, including the integrity of the Company's financial statements;
    (b)     the Company's compliance with legal and regulatory requirements;
    (c)     the independent auditor's qualifications and independence; and
    (d)     the performance of the Company's internal audit function and independent auditor; and

2.      Oversee preparation of the report that Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement.

B.      **Responsibilities**

The Committee's responsibilities are set forth in this Charter.  Among other things, it is the responsibility of the Committee to maintain free and open communication between the directors, the independent auditor, internal audit and the management of the Company. The Company's management is responsible, among other things, for preparing the financial statements and for the overall financial reporting process, including the Company's system of internal controls. The independent auditor's responsibilities include auditing the financial statements and expressing an opinion on the conformity of the audited financial statements with U.S. generally accepted accounting principles.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company.  The Committee has the sole authority to engage outside counsel and other advisors it determines to retain to carry out its responsibilities and shall receive appropriate funding from the Company, as determined by the Committee, for payment of (i) compensation to any such advisors, (ii) compensation to the independent auditor, and (iii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its responsibilities. To assist it in carrying out its responsibilities, the Committee may form and delegate authority to subcommittees consisting of one or more members when appropriate.

*\*\*\**

Review earnings press releases and discuss, in a general manner, the types of information to be disclosed and the type of presentation to be made in the Company's earnings press releases (paying particular attention to any use of "proforma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies.

*\*\*\**

Coordinate and communicate with the Board's Commercial Strategies and Operational Risk Committee regarding the Company's strategic and operational risks, and other major risks that may be overseen by that Committee from time to time.

Review and discuss with management: (a) the Company's other most significant risks; (b) risk issues associated with the Company's overall financial reporting, disclosure process, legal matters, regulatory compliance, cybersecurity and information technology, as well as accounting risk exposure; and (c) the Company's methods of risk assessment, risk mitigation strategies and the overall effectiveness of the Company's guidelines, policies and systems with respect to risk assessment and management, including policies and procedures for derivative and

foreign exchange transactions and insurance coverage.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background

31.     Fluor operates through its six (6) principal segments: (i) Energy & Chemicals; (ii) Mining & Industrial; (iii) Infrastructure & Power; (iv) Government; (v) Diversified Services; and (vi) Other.  As of December 31, 2019, the Company ranked number 164 on the FORTUNE 500® list, the second largest engineering and construction company to make the list.

32.     Through the Company's Government segment, the Company provides engineering, construction, logistics, base and facilities operations and maintenance, contingency response and environmental and nuclear services to the U.S. and foreign governments.  Prior to April 21, 2016, the Company was awarded a contract to complete the Radford Project in which Fluor was to construct a nitrocellulose facility, boiler, and warehouse at the Radford Army Ammunition Plant.

33.     As an engineering contractor, Fluor bids to perform services under two different types of contracts: (i) "reimbursable contracts" or (ii) "fixed-price contracts."  Under reimbursable contracts, Fluor provides its services and is reimbursed for its expenses, plus an additional fee for the service performed. By contrast, fixed-priced contracts typically involve a set, negotiated fee which would include the projected costs of the work and any additional fee for the Company's services. Thus, under fixed-price contracts, the amount of profit Fluor receives directly depends on its ability to accurately plan for the costs of the project and complete the project without exceeding those expected costs, because any cost overruns would not be reimbursed by the customer and would therefore cut into Fluor's profit.

34.     Fluor recognizes revenue from its contracts under the percentage-of-completion method which is based on contract cost incurred to date compared to total estimated contract cost.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**
**ISSUED DURING THE RELEVANT PERIOD**

35. On November 2, 2017, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2017. For the third quarter of 2017, the Company reported revenue of approximately $4.9 billion and net earnings of approximately $94 million.

36. Further, the Company's reported revenue for the quarter included approximately $9 million from its submission of "change orders" to its clients. In the third quarter 2017 Form 10-Q, the Company stated in pertinent part:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined that recovery of incurred costs is probable and the amounts can be reliably estimated. Under claims accounting (ASC 605-35-25), these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. . . . The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. As of September 30, 2017 and December 31, 2016, the company had recorded $80 million and $61 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract work in progress. . . . The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 605-35-25.

37. On February 20, 2018, Defendants caused the Company to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2017. For the fourth quarter of 2017, the Company reported revenue of approximately $5 billion and net earnings of approximately $60 million.

38. The Company's reported revenue for the quarter included approximately $44

million from its submission of change orders to its clients.  In the 2017 Form 10-K, the Company

stated in relevant part:  "As of December 31, 2017 and 2016, the company had recorded $124

million and $61 million, respectively, of claim revenue for costs incurred to date and such costs

are included in contract work in progress."

39.     On May 3, 2018, Defendants caused the Company to file its quarterly report on

Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter

ended March 31, 2018. For the first quarter of 2018, the Company reported revenue of

approximately $4.8 billion and a net loss of approximately $18 million.

40.     The Company's reported revenue for the quarter included approximately $10

million from its submission of change orders to its clients.  In the first quarter 2018 Form 10-Q,

the Company stated in pertinent part:  "As of March 31, 2018 and December 31, 2017, the company

had recorded $134 million and $124 million, respectively, of claim revenue for costs incurred to

date and such costs are included in contract assets."

41.     On August 2, 2018, Defendants caused the Company to file its quarterly report on

Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter

ended June 30, 2018.  For the second quarter of 2018, the Company reported revenue of

approximately $4.9 billion and net earnings of approximately $115 million.

42.     In the second quarter 2018 Form 10-Q, the Company stated in relevant part:  "As

of June 30, 2018 and December 31, 2017, the company had recorded $132 million and $124

million, respectively, of claim revenue for costs incurred to date and such costs are included in

contract assets."

43.     On November 1, 2018, Defendants caused the Company to file its quarterly report

on Form 10-Q with the SEC, reporting the Company's financial and operating results for the

quarter ended September 30, 2018.

44.     For the third quarter of 2018, the Company reported revenue of approximately $4.7 billion and net earnings of approximately $77 million.

45.     The Company's reported revenue for the quarter included approximately $24 million from its submission of change orders to its clients.  In the third quarter 2018 Form 10-Q, the Company stated in relevant part: "As of September 30, 2018 and December 31, 2017, the company had recorded $156 million and $124 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets."

46.     On February 21, 2019, Defendants caused the Company to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018.  For the fourth quarter of 2018, the Company reported revenue of approximately $4.8 billion and net earnings of approximately $50 million.

47.     The Company's reported revenue for the quarter included approximately $10 million from its submission of change orders to its clients.  In the 2018 10-K, the Company stated in pertinent part: "As of December 31, 2018 and 2017, the company had recorded $166 million and $124 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets."

48.     On May 2, 2019, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019.  For the first quarter of 2019, the Company reported revenue of approximately $4.2 billion and a net loss of approximately $58 million.

49.     The Company's reported revenue for the quarter included approximately $9 million from its submission of change orders to its clients.  In the first quarter 2019 10-Q, the Company

stated in pertinent part: "As of March 31, 2019 and December 31, 2018, the company had recorded $175 million and $166 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets."

50.     On August 1, 2019, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019. For the second quarter of 2019, the Company reported revenue of approximately $4.1 billion and a net loss of approximately $555 million.

51.     The Company's reported revenue for the quarter included approximately $21 million from its submission of change orders to its clients.  In the second quarter 2019 10-Q, the Company stated in pertinent part: "As of June 30, 2019 and December 31, 2018, the company had recorded $196 million and $166 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets."

52.     On October 31, 2019, Defendants caused the Company to file its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019.  For the third quarter of 2019, Defendants reported revenue of approximately $3.9 billion and a net loss of approximately $782 million.

53.     The Company's reported revenue for the quarter included approximately $9 million from its submission of "change orders" to its clients.  In the third quarter 2019 Form 10-Q, the Company stated in pertinent part: "As of September 30, 2019 and December 31, 2018, the company had recorded $205 million and $166 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets."

54.     The statements referenced above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made, in light of the

circumstances under which they were made, not false and misleading.  Specifically, Defendants

willfully or recklessly made and/or caused the Company to make false and misleading statements

to the investing public that failed to disclose, *inter alia*, that (i) the Company's earnings were

inflated each quarter as a result of the Company's practice of improperly recognizing revenue on

the 2Q 2019 Projects; and (ii) the revenue the Company had been recognizing from its submissions

of change orders was inflated as the Company did not have a reasonable basis to believe that it

was "probable that a significant reversal in the amount of cumulative revenue recognized will not

occur."  As a result, Defendants cause the Company's public statements to be materially false and

misleading at all relevant times.

## THE TRUTH EMERGES

55.     On May 2, 2019, the Company disclosed that CEO Seaton had left the Company,

effective immediately, and would be replaced by interim CEO and Chief Legal Officer Carlos M.

Hernandez.  In addition, the Company significantly reduced its earnings guidance and disclosed

that it had incurred over $100 million in charges on various projects due, in part, to the Company's

"revenue recognition" practices.  On this news, the Company's share price fell $9.43 per share, or

24%, closing at $29.72 per share on May 2, 2019.

56.     On August 1, 2019, the Company revealed that it would be taking a $714 million

pre-tax charge on the 2Q 2019 Projects, including incurring a $233 million charge related to the

Radford Project.  On this news, the Company's share price fell $8.24 per share, over 26%, closing

at $22.67 per share on August 2, 2019.

57.     On February 18, 2020, the Company revealed that the SEC was investigating its

revenue recognition practices related to the 2Q 2019 Projects, and had requested information

related to the 16 projects on which the Company took charges in the second quarter of its fiscal

year 2019. In addition, the Company announced that it had also commenced an internal investigation into the 2Q 2019 Projects, "focusing initially on the Radford [Project]." As a result of these investigations, the Company announced that it would not be able to complete and file its Form 10-K on time.

58.     On this news, the Company's share price fell $4.75 per share, over 24%, closing at $14.79 per share on February 18, 2020.

## DUTIES OF THE DIRECTOR DEFENDANTS

59.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

60.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

61.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the

Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

62.     Each Director Defendant, by virtue of his or her position as a director and/or officer,

owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

63.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

65.     Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

66.     Plaintiffs are current owners of the Company stock and have continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

67.     During the illegal and wrongful course of conduct at the Company and through the

present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

68.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

69.   The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

70.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

71.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

72.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Hernandez**

73.     The principal professional occupation of Defendant Hernandez is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   Additionally, Hernandez is a named defendant in the securities class action entitled *Union Asset Management Holding AG v. Fluor Corporation, et al.*, Case 3:20-cv-00518-B (N.D. Tex.) (the "Securities Class Action").

**Defendants Bennet, Barker, Berkery, McWhinney and Rose**

74.     Demand is excused because Defendants Bennet, Barker, Berkery, McWhinney and Rose face a substantial likelihood of liability for their misconduct.

75.     During the Relevant Period, Defendants Bennet, Barker, Berkery, McWhinney and Rose served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

76.     Defendants Bennet, Barker, Berkery, McWhinney and Rose breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Bennet, Barker, Berkery, McWhinney and Rose face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Barker, Bennett, Berkery Fluor, McWhinney, Rose and Olivera**

77.     Defendants Barker, Bennett, Berkery Fluor, McWhinney, Rose and Olivera each signed the false and misleading 2017 Form 10-K.  These Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that (i) the Company's earnings were inflated each quarter as a result of the Company's practice of improperly recognizing revenue on the 2Q 2019 Projects; and (ii) the revenue the Company had been recognizing from its submissions of change orders was inflated as the Company did not have a reasonable basis to believe that it was "probable that a significant reversal in the amount of cumulative revenue recognized will not occur."

**Defendants Barker, Bennett, Berkery, Fluor, Hackett, McWhinney, Rose and Olivera**

78.     Defendants Barker, Bennett, Berkery, Fluor, Hackett, McWhinney, Rose and Olivera each signed the false and misleading 2018 Form 10-K.  These Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that (i) the Company's earnings were inflated each quarter as a result of the Company's practice of improperly recognizing revenue on the 2Q 2019 Projects; and (ii) the revenue the Company had been recognizing from its submissions of change orders was inflated as the Company did not have a reasonable basis to believe that it was "probable that a significant reversal in the amount of cumulative revenue recognized will not occur."

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

79.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

80.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

81.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

82.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

83.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

84.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

85.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

86.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

87.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

88.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

89.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### (Against the Director Defendants for Violations of
### Section 10(b) of the Exchange Act and SEC Rule 10b-5)

90.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

91.     During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose that (i) the Company's earnings were inflated each quarter as a result of the Company's practice of improperly recognizing revenue on the 2Q 2019 Projects; and (ii) the revenue the Company had been recognizing from its submissions of change orders was inflated as the Company did not have a reasonable basis to believe that it was "probable that a significant reversal in the amount of cumulative revenue recognized will not occur."  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.  Despite this artificial inflation in the price of the Company's shares, the Director

Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

92.     As alleged herein, Director Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Director Defendants, by virtue of their receipt of information reflecting the true facts regarding Fluor, their control over, and/or receipt and/or modification of Fluor's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fluor, participated in the fraudulent scheme alleged herein.

93.     Director Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Director Defendants.

94.     The Director Defendants were each members of Fluor's Board during the aforesaid time period.  Based on their roles at Fluor, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

95.     At a minimum, the Director Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Fluor,

the Director Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

96.     Likewise, the Director Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Director Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

97.     As such Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Fluor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Fluor restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on issues so triable.


Dated: April 10, 2020

                                        **O'KELLY & ERNST, LLC**

                                        */s/ Ryan M. Ernst*
                                        Ryan M. Ernst (No. 4788)
                                        824 N. Market Street, Suite 1001A
                                        Wilmington, DE 19801
                                        Phone (302) 778-4000
                                        Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*